IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| HAL LEE WEST, | ) | |
| | ) | Case No. CV06-51-S-LMB |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM DECISION** |
| vs. | ) | **AND ORDER** |
| | ) | |
| KENNETH BENNETT; GEORGE MILLER; DR. DAWSON; ANDY MITCHEN, and P.A. HENGST; | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

On March 31, 2009, this Court issued a Memorandum Decision and Order granting in part and denying in part without prejudice Defendants' Motion to Dismiss, or Alternatively, Motion for Summary Judgment. *See* Memorandum Decision and Order (Docket No. 99). The Court determined that Defendants were not deliberately indifferent to Plaintiff's serious medical needs during the time period up to July 2006, but that the record was insufficient to grant summary judgment for the time period of July 2006 through May 2007, and 2008 and after. The Court allowed Defendants to supplement their Motion and the record with evidence supporting their argument that they were not deliberately indifferent to Plaintiff's medical needs after July of 2006. The CMS Defendants did so on April 30, 2009. *See* Docket Nos. 100, 101, and 103. The IDOC Defendants joined in this supplement. *See* Docket No. 102. Plaintiff did not respond.

Having reviewed the record, including the supplemental memorandum and affidavits submitted by Defendants, the Court has determined that oral argument would not significantly assist in resolving the remainder of Defendants' Motion. Accordingly, based on the record

**MEMORANDUM DECISION AND ORDER - 1**

before the Court, the remainder of Defendants' Motion for Summary Judgment will be granted, as set forth in the following Memorandum Decision and Order.

## I. STANDARD OF LAW ON SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In a motion for summary judgment, the moving party bears the "initial burden of identifying for the court those portions of the record which demonstrate the absence of any genuine issues of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)). If the moving party points to portions of the record which demonstrate that there appears to be no genuine issue of material fact as to claims or defenses at issue, the burden of production shifts to the non-moving party. To meet its burden of production, the non-moving party "may not rest upon the mere allegations contained in his complaint, but he must set forth, by affidavits, exhibits or otherwise, specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; *see T.W. Electric Serv., Inc.*, 809 F.2d at 630 (internal citation omitted).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted).

**MEMORANDUM DECISION AND ORDER - 2**

Rule 56(c) requires the Court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 377 U.S. at 322. The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252.

To state a claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To prevail on an Eighth Amendment claim regarding prison medical care, Plaintiff must show that prison officials' "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

> The Ninth Circuit has defined a "serious medical need" in the following ways:
>
>> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (quotation omitted).

Deliberate indifference exists when an official knows of and disregards a serious medical

**MEMORANDUM DECISION AND ORDER - 3**

condition or when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws such an inference. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (footnotes omitted).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, [Plaintiff] must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk'" to Plaintiff's health. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980). A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990). The Ninth Circuit has clarified that if medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," summary judgment is appropriate. *Toguchi v. Chung*, 391 F.3d at 1061.

## II.  FACTUAL BACKGROUND AND ANALYSIS

**MEMORANDUM DECISION AND ORDER - 4**

A. **The CMS Defendants (Defendants Dawson, Hengst, and Machin)**

1. **Plaintiff's Epididymitis**

   a. <u>Undisputed Facts</u>

In November of 2004, Plaintiff was diagnosed with a condition known as "epididymits." Epididymitis is an inflammation of the epididymis, a coiled tube that collects sperm from the testicle and passes it on to the vas deferens. *See* Memorandum Decision and Order (Docket No. 99) at 15. This Court has previously determined that Plaintiff received adequate medical care for his epididymitis from September 2005 through July 2006. *See generally id.* The facts relevant to Plaintiff's condition and medical treatment in the period of time *after* July of 2006 are described below. All facts are taken in the light most favorable to Plaintiff.

Plaintiff complained of cysts on his testicles on September 10, 2006, requesting an examination to see if the cysts were, in fact, benign. Dr. Kennedy examined Plaintiff on September 14, 2006. Dr. Kennedy noted, however, that the primary abnormality was that Plaintiff's prostate was inflamed; Dr. Kennedy treated Plaintiff with antibiotics and pain medications. Supplemental Affidavit of April Dawson, M.D., in Support of Motion for Summary Judgment (Docket No. 103) ("Supp. Dawson Affidavit") at ¶ 5.

The next time Plaintiff was evaluated for his epididymitis was on December 20, 2006, when Dr. Kennedy again examined Plaintiff and noted that Plaintiff's testicles and prostate were tender, and that Plaintiff had symptoms of irritable bowel syndrome (IBS). Dr. Kennedy gave Plaintiff a lower bunk memo, a work limitation memo, and a frequent urination memo. Plaintiff's medication were also adjusted. *Id.* at ¶ 7.

In January of 2007, Plaintiff complained of abdominal pain, diarrhea, and urinary

**MEMORANDUM DECISION AND ORDER - 5**

retention and was taken to St. Alphonsus Regional Medical Center. A CT scan of Plaintiff's abdomen and pelvis was normal. After Plaintiff was taken back to Idaho State Correctional Institution (ISCI), Dr. Jo Elliot Blakeslee examined Plaintiff and prescribed fluids, Phenergan, Benadryl, Metamucil, Imodium and vicodin. Dr. Cordum performed an upper endoscopy and colonoscopy on Plaintiff and determined that there was no source for Plaintiff's pain. A small polyp was found and removed, but the tests were otherwise unremarkable. *Id.* at ¶ 8.

Plaintiff complained of further testicular pain on April 21, 2007. Dr. Kennedy examined Plaintiff on May 8, 2007. Dr. Kennedy determined that the only abnormality present was a number of small epidiymal cysts estimated to be less than one centimeter. Dr. Kennedy found no testicular masses and diagnosed Plaintiff with spermatocele symptomatic.[1] He prescribed Plaintiff the antibiotic doxycycline and the anti-nausea medication Phenergen. *Id.* at ¶ 9.

Plaintiff was next evaluated by Tom Fogg on June 1, 2007, and by Burt Glazier on June 4, 2007. Although Plaintiff had not submitted a Health Service Request form, or "Kite," Plaintiff was offered Tylenol and ibuprofen, which he refused. Dr. Kennedy again evaluated Plaintiff on June 5, 2007. Plaintiff admitted to Dr. Kennedy that he had only taken his doxycycline for one day. *Id.* at ¶ 10.

On June 14, 2007, after Plaintiff had been transferred to South Idaho Correctional Institution (SICI), Dr. Kennedy ordered a urinalysis. On July 2, 2007, Plaintiff received a testicular/scrotal ultrasound by Dr. Howard Schaff at St. Alphonsus Regional Medical Center.

---

[1] "Spermatocele, also known as a spermatic cyst, are typically painless, noncancerous (benign) cysts that grow from the epididymis near the top of the testicle. . . . If in fact the size becomes bothersome, or results in pain, then there are several treatment options to rectify the problem." http://www.urologyhealth.org/print/index.cfm?topic=530.

**MEMORANDUM DECISION AND ORDER - 6**

No testicular abnormality was present, although Plaintiff did have small epididymal head cysts. Plaintiff was referred to a urologist and saw Dr. Joseph Williams of the Idaho Urologic Institute on July 31, 2007. Because the cysts had not changed, Dr. Williams determined that Plaintiff had spermatoceles with a possible urethral stricture. Dr. Williams told Plaintiff that taking Advil once or twice a day should provide effective treatment. Dr. Williams suggested a follow-up cystoscopy.[2] *Id.* at ¶ 11.

P.A. Stedfeld also requested a cystoscopy, but Dr. Dawson deferred that request. She asked that P.A. Stedfeld discuss the necessity of a cystoscopy with Dr. Williams. P.A. Stedfeld then determined that Dr. Garrett would evaluate the need for a follow-up cystoscopy. On September 10, 2007, Dr. Garrett examined Plaintiff and stated that he did not believe a cystoscopy was necessary because there were no changes in Plaintiff's symptoms. *Id.* at ¶ 12.

Plaintiff's next complaint of testicular pain was on November 8, 2007. Dr. Garrett noted that Plaintiff's testes were normal, despite the fact that Plaintiff claimed to have new masses. Dr. Garrett noted no tenderness in the testes. *Id.* at ¶ 13.

P.A. Stedfeld next evaluated Plaintiff on February 8, 2008 and determined that Plaintiff was overreacting to the examination of his testes. Plaintiff submitted another Kite regarding testicular pain on February 24, 2008, and he was evaluated on March 11, 2008. Plaintiff received ibuprofen for his pain. Plaintiff was again evaluated on March 18 and 19, 2008. At these examinations, the findings were the same as the previous examinations. *Id.* at ¶ 14.

Dr. Garrett next evaluated Plaintiff on April 1, 2008 and diagnosed Plaintiff with a

---

[2] A cystoscopy is "a test that allows your doctor to look at the inside of the bladder and the urethra using a thin, lighted instrument called a cystoscope." http://www.webmd.com/a-to-z-guides/cystocopy-16692.

**MEMORANDUM DECISION AND ORDER - 7**

urethral stricture, which was the reason Dr. Williams had recommended a cystoscopy in July of 2007. Epididymal cysts were still present but otherwise unremarkable. On April 11, 2008, a post-voiding residual (PVR) test was performed and was normal. *Id.* at ¶ 15.

Dr. Garrett again examined Plaintiff on June 17, 2008 and noted no abnormalities except tenderness in the epididymis. Plaintiff's next appointment was on July 5, 2008. At this examination he was given ibuprofen. Plaintiff's bottom bunk, no stairs, and frequent urination memos were renewed on July 29, 2008. *Id.* at ¶ 16.

On August 27 and 28, 2008, Dr. Timothy McHugh examined Plaintiff and found that, although there was tenderness in Plaintiff's suprapubic area, Plaintiff was not in any acute distress. A cystoscopy was finally performed by Dr. Williams on September 26, 2008. The cystoscopy was normal, and after this visit with Dr. Williams, Plaintiff ceased complaining of pain with regard to his epididymitis. *Id.* at ¶ 17.

      b.    <u>Analysis</u>

In the approximately two years between July of 2006 and the final visit with Dr. Williams in September of 2008, Plaintiff was examined by prison medical staff and outside medical providers at least 23 times for symptoms relating to his epididymitis, including trips to the emergency room. Plaintiff was given various tests within this time period, all of which suggested that Plaintiff's medical needs were being sufficiently addressed. Plaintiff at times did not follow doctors' orders, admitting that he stopped taking a prescribed medication. After each of Plaintiff's complaints of pain, he was examined by medical personnel. This suggests that Plaintiff's medical care for his epididymitis was adequate and appropriate.

Plaintiff did suffer a delay of approximately 14 months from the very first time Dr.

**MEMORANDUM DECISION AND ORDER - 8**

Williams recommended a cystoscopy in July of 2007 until the cystoscopy was performed in September of 2008. However, a delay in treatment does not violate the Eighth Amendment unless the delay causes serious harm. *Wood*, 900 F.2d at 1335. Here, once Dr. Williams performed the cystoscopy, he found no abnormalities. Moreover, after this test, Plaintiff stopped complaining of pain. Therefore, the delay in performing the cystoscopy was harmless.

Defendants have met their burden of showing that their treatment of Plaintiff's epididymitis was not deliberately indifferent. This shifts the burden to Plaintiff to come forward with evidence showing deliberate indifference. Plaintiff has submitted nothing in response to Defendants' evidence. Therefore, the Court determines that no genuine issue of material fact exists as to Plaintiff's medical care after July of 2006, and that the CMS Defendants are entitled to judgment as a matter of law with respect to Plaintiff's treatment for his epididymitis.

  **2.** **Plaintiff's Blood Pressure and Heart Problems**

    a. <u>Undisputed Facts</u>

In addition to epididymitis, Plaintiff also complains that he suffers from high blood pressure and heart problems. In June of 2006, P.A. Hengst ordered six months worth of Lisinopril and Lopressor, high blood pressure medications. Plaintiff submitted a Kite on July 20, 2006, requesting that he be allowed to see a cardiologist for "true and proper diagnosis and treatment" of his high blood pressure. On July 26, 2006, P.A. Hengst again evaluated Plaintiff and noted that Plaintiff's blood pressure and pulse were completely normal. Plaintiff acknowledged that his blood pressure was "okay," but believed it could be better. Plaintiff admitted to P.A. Hengt that he had decreased his Lopressor medication in half, on his own, without approval from medical staff. Plaintiff's Lopressor was decreased until December 30 ,

**MEMORANDUM DECISION AND ORDER - 9**

2006. Supp. Dawson Affidavit at ¶ 18.

Plaintiff next complained of high blood pressure on September 10, 2006. Plaintiff also complained of discomfort in the chest. An EKG was normal, but Plaintiff was nonetheless examined by Dr. Kennedy on September 14, 2006. Dr. Kennedy treated Plaintiff's high blood pressure with Hydrochlorothiazide (HCTZ), a thiazide diuretic. *Id.* at ¶ 19.

On September 22, 2006, Plaintiff went to the chronic care clinic and agreed that his blood pressure was normal. Plaintiff's treatment plan at that time was to continue using Lopressor, Lisinopril, and HCTZ. These medications were thereafter provided on a regular basis. *Id.* at ¶ 20.

Plaintiff did not complain of any further blood pressure problems until July 30, 2007, when he asked that his blood pressure be checked. Although his blood pressure was determined to be 139/89, Plaintiff did not show up for a scheduled appointment with a physician's assistant. *Id.* at ¶ 21.

On January 2, 2008, Plaintiff complained of a cough and of chest pain. On January 23, 2008, Plaintiff visited the chronic care clinic. Plaintiff was prescribed antibiotics in addition to the cough syrup he was taking for his cough. *Id.* at ¶ 22.

On April 19, 2008, Plaintiff stated that he believed he was suffering from tachycardia (an abnormally high heart rate), that his blood pressure was "going crazy," and that he had chest pain. Plaintiff was sent to the emergency room, where a variety of tests were performed. Plaintiff's EKG was normal, as was Plaintiff's chest X-ray. When Plaintiff was discharged from the emergency room, his blood pressure was 129/82, and Plaintiff reported his pain at a 0 out of 10. *Id.* at ¶ 23.

**MEMORANDUM DECISION AND ORDER - 10**

Dr. Garrett evaluated Plaintiff on May 6, 2008.  He reviewed the lab report with Plaintiff, indicated that the EKG, labs, and exam were all normal, and told Plaintiff he was healthy.  *Id.* at ¶ 24.

On May 18, 2008, Plaintiff submitted a concern form regarding a history of "acute myocardial infarction."  This concern form was answered two days later.  On May 20, 2008, Dr. Garrett again examined Plaintiff.  Plaintiff told Dr. Garrett that he had heart damage, presenting a list of blood pressures and vital signs as proof.  Dr. Garrett told Plaintiff that his heart rate was normal at 88-92 beats per minute without murmur.  Plaintiff received a chest X-ray on May 28, 2008, which was normal.  *Id.* at ¶ 25.

On July 8, 2008, Plaintiff complained of chest pain on his left side.  Because the pain was localized and did not radiate out, providers believed that Plaintiff had a muscle spasm rather than a myocardial infarction.  However, because Plaintiff's complaints of pain continued, he was transferred to the emergency room.  All tests were normal, and Plaintiff was diagnosed with non-cardiac chest pain.  *Id.* at ¶ 26.

The next day, Plaintiff told the P.A. that his heart exam at the emergency room was good. Plaintiff stated he could not walk due to bladder issues.  Throughout July, Plaintiff's blood pressure continued to be monitored, and Plaintiff made no further complaints regarding his blood pressure until Plaintiff refused to take his medication.  On September 26, 2008, medical staff compared Plaintiff's medications to ensure that he was complying with his medical regimen. Plaintiff appeared to be taking his medications and had no complaints of high blood pressure. However, on October 1, 2008, medical staff learned that Plaintiff had stopped taking his medications on September 24, 2008.  Plaintiff did, however, continue to take his thyroid

**MEMORANDUM DECISION AND ORDER - 11**

medication, Levothyroxine.  *Id.* at ¶ 27.

Prior to Plaintiff's release from prison in January of 2009, medical staff instructed him to follow up on his hypertension with outside medical providers.  *Id.* at ¶ 28.

### b. Analysis

From July of 2006 to September of 2008, Plaintiff was examined by medical personnel at least 10 times for high blood pressure and chest pain.  As with his epididymitis, whenever Plaintiff complained of high blood pressure or heart problems, he was evaluated and given treatment.  Additionally, as with his epididymitis, Plaintiff was noncompliant with his medication, at times reducing it on his own and even ceasing taking it altogether.  The sheer number of Plaintiff's visits to medical personnel suggests that there was no deliberate indifference, particularly considering that tests were being routinely performed to ensure that Plaintiff's blood pressure was kept at appropriate levels.  When Plaintiff complained of chest pain, he was sent to the emergency room even though all signs pointed to a muscle spasm rather than a heart attack.  Indeed, the emergency room visit ended with a diagnosis of non-cardiac chest pain, with all tests being normal.

Defendants have again met their burden of showing that they were not deliberately indifferent to Plaintiff's blood pressure and chest pain.  Because Plaintiff has not submitted any evidence to the contrary, the Court determines that Plaintiff's medical care for his high blood pressure and heart issues passes constitutional muster.

### B. The IDOC Defendants (Defendants Bennett and Miller)

Because the CMS Defendants' treatment of Plaintiff's epididymitis, blood pressure, and heart problems satisfied the Eighth Amendment, the IDOC Defendants are also entitled to

summary judgment. There is no evidence that the IDOC Defendants interfered with or obstructed Plaintiff's medical treatment, which was at all times consistent with constitutional standards.

## III. CONCLUSION

The Defendants have already been granted summary judgment on Plaintiff's Eighth Amendment claims for the period prior to July of 2006. Having reviewed the supplemental memorandum and affidavits submitted by Defendants for the time period following July 2006, the Court now finds that there is no genuine issue of material fact and that Plaintiff's medical care for this time period was constitutionally sufficient. Therefore, Defendants' Motion for Summary Judgment will be granted in full.

## IV. ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Defendants' Motion to Dismiss, or Alternatively, Motion for Summary Judgment (Docket No. 71) is GRANTED in its totality;

IT IS FURTHER HEREBY ORDERED that Plaintiff's Complaint (Docket No. 3) is DISMISSED with prejudice.



DATED: **August 10, 2009**.

Honorable Larry M. Boyle
United States Magistrate Judge